UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO RIVERS UNITED,<br><br>                              Plaintiff,<br><br>     v.<br><br>UNITED STATES FOREST SERVICE,<br>and UNITED STATES FEDERAL<br>HIGHWAY ADMINISTRATION,<br><br>                              Defendants. | Case No. 1:11-CV-95-BLM<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it two motions to dismiss, one filed by the United States

Forest Service (Forest Service) and one by the United States Federal Highway

Administration (FHWA).  The motions are fully briefed and at issue.  The Court will

grant each motion in part, for the reasons explained below.

## BACKGROUND

**Introduction**

The State of Idaho has authorized oil companies to transport hundreds of oversized

loads along U.S. Highway 12, a route passing through the Clearwater National Forest and

paralleling two rivers that have been designated as Wild and Scenic Rivers under the

Wild and Scenic Rivers Act.  Plaintiff Idaho Rivers United (IRU) claims that the Forest Service and the FHWA failed to comply with their mandatory duty to regulate the transportation of those loads through federal land.

**Highway 12 and the Wild and Scenic River Corridor**

The Idaho segment of U.S. Highway 12 is a two-lane highway that runs 177 miles from the port of Lewiston east to Lolo Pass at the Montana border.  *See Amended Complaint (Dkt. No. 10)* at ¶ 66.  For much of its route through Idaho, Highway 12 passes through the Clearwater National Forest, federal land regulated by the Forest Service.  The State of Idaho constructed the Highway in the 1950s and '60s.  *Id.* at ¶ 79.  The Forest Service issued the State special use permits authorizing it to construct the Highway through the Forest.  *Id.*  Until 1995, the State administered the Highway pursuant to these special-use permits and two memoranda of understanding.  *Id.*  In 1995, the Forest Service conveyed an easement to the FHWA, which it then conveyed to the State.  *Id.* at ¶ 81.  The State recorded the Highway Easement Deed in 1997.  The Deed grants the Idaho Transportation Department ("ITD") "a right-of-way for the operation and maintenance of a highway" through the Forest.  *See Exhibit A (Dkt. No. 21-1)* at pg. 3.  The easement is subject to various conditions, including that the State shall "[p]rotect and preserve soil and vegetative cover and scenic and scenic and esthetic values on the right of way outside of construction limits."  *Id.* at pg. 6.

The Highway runs along the Middle Fork of the Clearwater and Lochsa Rivers.  Both rivers were designated as Wild and Scenic Rivers by the passage of the Wild and

Scenic Rivers Act in 1968.  *See* 16 U.S.C. § 1274(a)(1).  The Act tasked the Forest

Service with administration of these river systems "in such manner as to protect and

enhance . . . [their] esthetic, scenic, historic, archeologic, and scientific features."  16

U.S.C. § 1281(a).

The Surface Transportation Efficiency Act of 1991 directs the Secretary of

Transportation to "carry out a national scenic byways program that recognizes roads

having outstanding scenic, historic, cultural, natural, recreational, and archaeological

qualities."  23 U.S.C. § 162(a).  Pursuant to this statutory directive, the Secretary

designated Highway 12 as the "Northwest Passage Scenic Byway" in 2002.  *See Amended

Complaint* at ¶ 71.  Both before and after the designation of Highway 12 as a Scenic

Byway, the Department of Transportation awarded grants to the State for projects

supporting Highway's status as a Scenic Byway. Those grants included funding for the

drafting of a "corridor management plan," construction of various interpretive and

visitor's centers, and construction of passing lanes.  *Id.* at ¶¶ 70, 71.

**State Authorization of "Mega-load" Transportation.**

Around October of 2008, Imperial Resources Ventures Limited ("Imperial Oil"), a

partially-owned subsidiary of Exxon Mobil, contacted the IDT with a proposal to use

Highway 12 to transport equipment for use in tar sand mining and extraction to Alberta,

Canada.  *Id.* at ¶¶ 84, 89, 91.  Imperial Oil proposed barging pre-manufactured mining

equipment to the Port of Lewiston and then using Highway 12 to transport the equipment

through Idaho.

**Memorandum Decision and Order - 3**

On February 14, 2011, ITD issued a Memorandum of Decision authorizing Imperial Oil's proposal. The Memorandum authorizes Imperial Oil to use Highway 12 to transport "200 plus" separate loads, each of which significantly exceeds the State's height, width, length, and/or weight transportation restrictions. *Id.* at ¶ 85, 90. These "mega-loads" are so large that they occupy both lanes of Highway 12. *Id.* Imperial Oil's traffic control plan requires the mega-loads to travel at night, accompanied by twenty or more support vehicles. *Id.* ¶ 92. During the day, the loads will be parked in public turnouts along the highway. *Id.*

With ITD's permission, Imperial Oil has made modifications along Highway 12 in preparation for the mega-loads. In 2009, Imperial Oil paid for utility companies to upgrade utility lines that did not provide sufficient clearance. *Id.* at ¶ 93. Also in 2009, the company's contractor, Kiewit, trimmed hundreds of trees along the highway right-of-way, including over 500 in the Clearwater National Forest. *Id.* Kiewit also resurfaced and reinforced nine turnouts along Highway 12. *Id.*

In light of ITD's approval of Imperial Oil's transportation plan and the modification of the highway to accommodate those loads, several other companies have approached ITD about transporting mega-loads over Highway 12. *Id.* at ¶ 102. On February 11, 2011, ConocoPhillips began transporting four oversized loads, along Highway 12 , from Lewiston to an oil refinery in Billings, Montana. *Id.* at ¶ 98. The Conoco loads delayed traffic along Highway 12, *id.* at ¶ 108, and occupied public turnouts where they "were parked . . . for days or weeks at a time," *id.* at ¶ 109.

**Memorandum Decision and Order - 4**

ITD also issued a permit for Imperial Oil to transport a load as a "test validation module." *Id.* at ¶ 94. The test module left Lewiston on the evening of April 12, 2011. *Id.* at ¶ 95. That night, the module clipped a guy wire, resulting in the downing of a power line. *Id.* at ¶ 46. The module was moved to a turnout and parked there for two weeks while Imperial Oil upgraded additional utility lines and trimmed trees to create greater clearance. *Id.* at ¶ 97. Many of the trimmed trees were in the Clearwater National Forest and/or the Wild and Scenic River corridor. *Id.*

**Procedural History**

Though the Forest Service and the FHWA have expressed concern about the impact of mega-load transport on Highway 12 and the Wild and Scenic River corridor, neither agency has taken any action to prevent or regulate the loads. Both agencies have taken the position that they lack authority to regulate the mega-load transports. *Id.* at ¶¶ 122, 144.

The Forest Service stated its position in a September 10, 2010 letter from Clearwater National Forest Supervisor Rick Brazell ("Supervisor Brazell") to ITD. The letter raised concerns about the impact of the mega-load transports on the Wild and Scenic River corridor. Supervisor Brazell stated, however, that "I recognize that I have no jurisdiction to stop these shipments . . . ." *Id.* at ¶ 123.

The Secretary of Transportation, Ray LaHood, expressed his position in correspondence with Congressman Peter DeFazio. Secretary LaHood, in reply to a letter from Congressman DeFazio requesting that the FHWA investigate the mega-load

**Memorandum Decision and Order - 5**

permitting process, responded that "permit issuance for movement of this equipment is the responsibility of the states, not the Federal government."  *Id.* at ¶ 144.

Plaintiff Idaho Rivers United (IRU) is a non-profit conservation organization, whose mission is "to protect and restore the rivers of Idaho."  *Id.* at ¶ 13.  On March 10, 2011, IRU filed their first Complaint, alleging that the Forest Service had a mandatory duty to regulate mega-load transportation through the Clearwater National Forest and along the Wild and Scenic River corridor.  On June 15, 2011 IRU amended their complaint to add the FHWA as a defendant. The Amended Complaint alleged that the FHWA failed to notify the State of Idaho, pursuant to 23 U.S.C. § 116(c), that the State's authorization of mega-load transport amounted to improper maintenance of federal highway projects along Highway 12. Both defendants now move to dismiss the Amended Complaint.

## LEGAL STANDARD

In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  The issue is not whether the plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citations omitted).

## ANALYSIS

IRU's Amended Complaint asserts four claims for relief, each brought pursuant to

the judicial review provisions of the Administrative Procedures Act.  These claims for

relief rely on two related but distinct legal theories. In the Second, Third, and Fourth

Claims for Relief, IRU alleges that the Forest Service and/or the FHWA have failed to

act, violating a discrete, mandatory duty to regulate mega-load transportation along

Highway 12.  They argue that this duty flows from various federal statutes, regulations,

and land management plans.

　　　　In the First Claim for Relief, IRU alleges that even if the Forest Service does not

have a *mandatory* duty to act, it does have *discretionary* authority to regulate mega-load

trucking.  Relying on *Montana Air Chapter No. 29 v. Fair Labor Relations Authority*, 898

F.2d 753, 756 (9th Cir. 1990) ("*Montana Air*"), IRU argues that both agencies failed to

act based on the erroneous conclusion that they lack jurisdiction to do so, and therefore

IRU is entitled to limited declaratory relief stating that the agencies do in fact possess

authority and jurisdiction to regulate mega-load transportation.

　　　　Defendants move to dismiss the Amended Complaint on the grounds that neither

agency has a mandatory duty to undertake any particular regulatory or enforcement action

under any of the sources of authority cited by IRU.  The Court will turn to this argument,

and examine it first in the context of the Second Claim.

**Second Claim for Relief**

　　　　In its Second Claim, IRU alleges that the Forest Service violated its "affirmative,

mandatory duty" to regulate mega-load transport under the Wild and Scenic Rivers Act

(WSRA) and the National Forest Management Act (NFMA).  *See Amended Complaint,*

**Memorandum Decision and Order - 7**

*supra* at ¶ 157.  This Claim goes on to allege two different theories about how this mandatory duty was violated.  First, IRU alleges that it is challenging "discrete, identifiable agency actions" under § 702(2) of the APA, consisting of the Forest Service letters authorizing the mega-loads and approving tree-trimming.  Second, IRU also sues under § 706(1), the provision allowing challenges to "agency action unlawfully withheld," alleging that the Forest Service that the Forest Service failed to take action to enforce the WSRA.

The Court turns to the first theory challenging "discrete" agency action consisting of the two agency letters.  The APA requires that the agency action be "final" before it may be reviewed by a court, *see* 5 U.S.C. § 704, and the Forest Service argues that the letters are not final agency action.

Both letters are in response to IRU's petitions.  The first, dated April 26, 2011, rejects IRU's request that the Forest Service halt all tree trimming, and states that "the easement includes the right to manage vegetation within the construction limits of the highway."  *See Amended Complaint* at ¶ 134.  The second is dated September 10, 2010, and written by Clearwater National Forest Supervisor Rick Brazell in response to IRU's request to halt the mega-loads.  Supervisor Brazell concluded that "I recognize that I have no jurisdiction to stop these shipments."  *Id.* at ¶ 124.

To be subject to judicial review under the APA, the decisions made in these two letters must constitute "agency action."  *SUWA*, 542 U.S. at 62.  Agency action includes action "on the application or petition of, and beneficial to, a person."  5 U.S.C. § 551(11).

**Memorandum Decision and Order - 8**

It also includes "the equivalent or denial thereof." *Id*. at § 551(13).  Here, the Forest Service denied IRU's petition in the two letter decisions, and thus each constitutes "agency action" under the APA.

The agency action must also be "final" – that is it must (1) "mark the consummation of the agency's decision-making process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett,* 520 U.S. at 178 (internal quotations omitted).  "'[T]he core question is whether the agency has completed its decision making process, and whether the result of that process is one that will directly affect the parties." *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotations omitted).  In determining whether an agency's action is final, courts must look to whether the action "amounts to a definitive statement of the agency's position." *Id.*  The focus is on the practical and legal effects of the agency action: "[T]he finality element must be interpreted in a pragmatic and flexible manner." *Id.*

Under these standards, the two Forest Service letters constitute final agency action subject to judicial review.  In the letters, the Forest Service rejects IRU's petitions by declining jurisdiction in language demonstrating that it had completed its decision-making process on these issues.  The letters had both a practical effect and a legal consequence:  By rejecting IRU's petition to block the mega-loads and stop the tree trimming, the Forest Service essentially approved the convoy's procession through the Clearwater National Forest on Highway 12.  Consequently, the letters are final agency

action subject to judicial review under the standards set forth above.

The Court turns next to the second theory advanced by IRU under its Second Claim: That the Forest Service failed to take action to enforce its mandatory duties under the WSRA prompting judicial review under § 706(1) of the APA.  That provision authorizes courts to "compel agency action unlawfully withheld."

An agency decision to withhold action would appear on its face to be just as amenable to judicial review as an agency decision to act – in both cases, the agency is making a decision that could be reviewed under the deferential arbitrary and capricious standard.  And an agency's decision to stand down is often the product of the same lobbying that prompts agency action, as prominent scholar Cass Sunstein has noted: "[A]gency inaction, or lax enforcement, is often conspicuously the product of sustained organizing effort of regulated entities."  Sunstein, *Deregulation and the Hard-Look Doctrine*, S.Ct. Rev. 177, 186 (1983).

Nevertheless, the Supreme Court has shielded agency inaction from judicial review to a greater extent than agency action.  *See Wright and Koch, Federal Practice & Procedure* § 8387 (2006) (finding that Supreme Court precedent "greatly inhibits the lower courts in considering any form of review of inaction").  A rare unanimous Supreme Court decision – *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*") – is one source for this restrictive view.

*SUWA* held that agency action is unlawfully withheld only "where a plaintiff asserts than an agency failed to take a *discrete* agency action that it is *required to take*."

**Memorandum Decision and Order - 10**

*Id.* at 64 (emphasis in original).  In *SUWA,* the plaintiffs challenged the BLM's failure to

ban off-road vehicles in BLM lands designated as wilderness study areas pursuant to the

Federal Land Policy and Management Act of 1976 (FLPMA).  The pertinent federal law

required the BLM to manage the wilderness study areas "in a manner so as not to impair

the suitability of such areas for preservation as wilderness."  43 U.S.C. § 59.  This statute,

the Court ruled, did not require discrete agency action because it "does not mandate, with

the clarity necessary to support judicial action under § 706(1), the total exclusion of ORV

use." *SUWA*, 542 U.S. at 66.

Plaintiffs argued, however, that the court could simply issue an order requiring the

agency to comply with the directive to manage the area "so as not to impair" its

wilderness character without suggesting any particular manner of compliance.  The Court

rejected this option, reasoning that,

> [i]f courts were empowered to enter general orders compelling compliance with
> broad statutory mandates, they would necessarily be empowered, as well, to
> determine whether compliance was achieved – which would mean that it would
> ultimately become the task of the supervising court, rather than the agency, to
> work out compliance with the broad statutory mandate, injecting the judge into
> day-to-day agency management.

*Id.* at 66-67.

The Court also rejected the argument that the BLM had failed to comply with its

own land use plans.  *Id.* at 67.  Notwithstanding a statutory provision directing the BLM

to "manage the public lands . . . in accordance with the land use plans," 43 U.S.C. §

1732(a), the Court held that federal land use plans are "generally a statement of priorities;

[that] guides and constrains actions, but does not (at least in the usual case) prescribe

**Memorandum Decision and Order - 11**

them." *Id.* at 71.  The Court ruled that, therefore, the BLM land use plans at issue did not impose a legally binding commitment on the agency.  *Id.* at 72.

IRU argues that, in contrast to *SUWA*, various authorities require the Forest Service to take discrete and legally required action in response to mega-load transportation.  IRU argues that the Forest Service is bound by the Wild and Scenic Rivers Act (WSRA), Forest Service regulations, and Forest Service management plans, including the Clearwater Forest Plan ("Forest Plan"), the Design for Wild and Scenic Rivers ("River Plan"), and the U.S. Highway 12 Corridor Highway Improvement and Maintenance Strategy and Implementation Guidelines ("Corridor Maintenance Plan"). The Court examines each of these authorities in turn to determine if they (1) legally require the Forest Service to take action act and if so, (2) whether the required action is a discrete agency action.  *Id.* at 64.

### a.    The Wild and Scenic Rivers Act

The route of the mega-loads – along Highway 12 – parallels the Middle Fork of the Clearwater River for about 20 miles and then parallels the Lochsa River for about 70 miles.  Both rivers have been designated as Wild and Scenic Rivers under the WSRA because they "possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, . . . or other similar values."  *See* 16 U.S.C. §1271.  The intent of Congress was that such rivers be "preserved in free-flowing condition, and . . . protected for the benefit and enjoyment of present and future generations."  *Id.*

The mega-loads are so big that they spill over the pavement of the Highway,

requiring extensive tree trimming and utility pole relocation.  The loads vary in size, the largest being over 24 feet wide, 196 feet long, and 30 feet tall.  *See Amended Complaint* at ¶ 85.  Each module being transported weighs about 300,000 pounds.  *Id*.  Even with a cleared path, their immense bulk requires a slow procession, and they often stop for weeks at turnouts along the rivers.  And the modules are just part of a convoy of 20 or more vehicles, including a super-sized pull truck, a super-sized push truck, at least two police cars, and an ambulance.  *Id*. at ¶ 92.   Idaho has approved over 200 of these shipments to travel this Wild and Scenic River Corridor.

These shipments concerned the Forest Service Supervisor who forecast that they would "introduce overtly industrial elements into the otherwise pastoral environment." *Id*. at ¶ 104.  He explained that,

> while one or two projects might be tolerated, more frequent occurrences of such loads are not the experience people traveling, living, working, and recreating on US Highway 12 expect. I do not believe this was the intent when Congress passed the Wild and Scenic Rivers Act which did allow states to retain certain right of way rights.

*Id*. at ¶ 113.  Yet when IRU urged the Forest Service to act, the agency responded that it had no authority to act.

IRU takes issue with that conclusion, arguing that the WSRA imposes a discrete and mandatory duty on the Forest Service to prevent mega-load transport along Highway 12. They cite to two provisions of the Act.  The first, found at 16 U.S.C. § 1283(a), states that the Forest Service "shall take such action respecting management policies, regulations, contracts, plans, affecting such lands . . . as may be necessary to protect such rivers in

accordance with the purposes of this chapter."  The second, found at § 1281(a), states that in administration of the "national wild and scenic river system . . . primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic, and scientific features."

The first provision states that the Forest Service "shall . . . protect" the two rivers; the second provision states that the Forest Service "shall" give "primary emphasis" to "protecting  [the rivers'] esthetic [and] scenic" features.  The statutory objective is mandatory:  The Forest Service shall protect the esthetic and scenic features of the Lochsa and Middle Fork Clearwater rivers.

Of course, the statute in *SUWA* also had a mandatory objective.  *SUWA*, 542 U.S. at 66 (observing that statute at issue "is mandatory as to the object to be achieved").  That was not enough to allow judicial review because even the "mandatory . . . object . . .leaves [the agency] a great deal of discretion in deciding how to achieve it," and the APA forbids courts from "work[ing] out compliance with the broad statutory mandate [and] inject[ing] the judge into the day-to-day agency management."  *Id*. at 66-67.

Like the provision of FLPMA considered by the *SUWA* Court, the WSRA provisions cited above (§ 1283(a) and § 1281(a)) do impose a mandatory duty, but it is a duty that "lack[s] the specificity requisite for agency action." *Id.*  The provision of FLPMA at issue in *SUWA* required the BLM to manage designated wilderness study areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness."  43 U.S.C. § 1782(c).  Here, the mandate of 16 U.S.C. § 1283(a) is at least as general.  The law directs that the Forest Service act to "protect such rivers in accordance

with the purposes of this chapter." Those purposes are identified in §§ 1271 and 1272. They include protecting the "scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values" of Wild and Scenic Rivers for the "benefit and enjoyment of present and future generations," "protect[ing] the water quality of such rivers, and "fulfill[ing] other vital national conservation purposes." *Id.* § 1271. Section 1281(a) is even less precise in its mandate. It specifies that the Forest Service give primary, not exclusive, priority to preserving five general qualities of the river systems.

The broad policy goals of § 1283(a) and § 1281(a) "leave[] the [Forest Service] a great deal of discretion in deciding how to achieve [them]." *Id.* at 65. The Court could not "determine whether compliance was achieved" without "injecting [itself] into day-to-day agency management." *Id.* at 67. The Court therefore concludes that 16 U.S.C. §§ 1283(a) and 1281(a) do not mandate discrete agency action.

### b.    Forest Service Regulations

The Amended Complaint alleges that the transport of mega-loads violate Forest Service regulations prohibiting excessive noise near a campsite, damaging or blocking a road, and parking a vehicle in a manner which creates a safety hazard. These prohibitions apply to "[a]n act or omission [that] affects, threatens, or endangers property of the United States administered by the Forest Service." 36 C.F.R. § 261.1. However, the existence of administrative regulations vesting a federal agency with law enforcement authority does not authorize the court to oversee the agency's exercise of that discretionary authority. As the Supreme Court explained in *Heckler v. Chaney*, 470 U.S.

821, 831-32 (1985), agency exercise of discretionary law enforcement authority is not

amenable to judicial oversight:

> the agency must not only assess whether a violation has occurred, but whether
> agency resources are best spent on this violation or another, whether the agency is
> likely to succeed if it acts, whether the particular enforcement action requested
> best fits the agency's overall policies, and, indeed, whether the agency has enough
> resources to undertake the action at all. An agency generally cannot act against
> each technical violation of the statute it is charged with enforcing. The agency is
> far better equipped than the courts to deal with the many variables involved in the
> proper ordering of its priorities.

Accordingly, the Court holds that the Forest Service does not have a non-discretionary

duty to enforce the provisions of the Code of Federal Regulations to sanction mega-load

trucking in the Clearwater National Forest.

**c.      Forest Service Management Plans**

IRU also alleges that the Forest Service's inaction is inconsistent with various

policies promulgated by the Forest Service itself, namely "the River Plan, the Corridor

Maintenance Strategy, [and] the Forest Plan."  *See Amended Complaint* at ¶ 158.  IRU

argues that even if 16 U.S.C. § 1283(a) does not compel discrete agency action in its own

right, it serves to make all of the Forest Service's management plans legally binding

because it states that the Forest Service "shall take such action respecting management

policies, regulations, contracts, plans . . . , as may be necessary to protect such rivers in

accordance with the purposes of this chapter." 16 U.S.C. § 1283(a).

But this argument is again precluded by the Supreme Court's ruling in *SUWA*.

The *SUWA* Court held that BLM land use plans did not create a legally binding

commitment, despite the statutory mandate that the BLM "shall manage the public lands .

**Memorandum Decision and Order - 16**

. . in accordance with the land use plans." *Id.* at 67 (quoting 43 U.S.C. § 1732(a)). Because land use plans are generally an expression of priorities, an agency statement "about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made the basis for a suit under § 706(1)." *Id.* at 71.

IRU argues that because Congress directed that the Forest Service "shall" take action respecting its management plans, compliance is demanded by law. *See* 16 U.S.C. § 1283.  But the same phrasing was encountered in *SUWA* – the BLM was directed to comply with its management plans by the same statutory language – and the Supreme Court nonetheless held that those land use plans did not create a legally binding commitment.  *SUWA*, 542 U.S. at 67, 72.  Under the statute at issue in *SUWA* and the statute at issue here, the "statutory directive" requires that when the respective agency takes action, it must be consistent with its management plans.  *SUWA*, 542 U.S. at 69. That mandate, however, did not suffice to persuade the *SUWA* Court to "go further, and conclude that a statement in a plan that BLM 'will' take this, that, or the other action, is a binding commitment that can be compelled under § 706(1)."  *Id.*  Instead, the Court stated that a management plan does not set forth a legally binding commitment unless (1) the promulgation of the management plan makes clear that it is an "implementation decision" rather than a "policy determination," *id.* at 70, or (2) "the language in the plan itself creates a commitment binding on the agency." *id.* at 71.

The Court has reviewed the Forest Plan and the Corridor Maintenance Strategy

**Memorandum Decision and Order - 17**

referenced in the Amended Complaint and attached to the briefing. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (court may examine documents of undisputed authenticity referenced in complaint). It has also reviewed language in the Amended Complaint quoted from the "River Plan."[1] *See Amended Complaint* at ¶¶ 60-61. Nothing suggests that the management objectives or policy goals expressed in these documents can be read as an implementation decision binding the Forest Service to a precise course of action. To the contrary, each expresses policy or management goals that can only be read as a "statement of priorities" for the Forest Service. *SUWA*, 542 U.S. at 72. The Court concludes that the three cited management plans, like the BLM land use plans at issue in *SUWA*, do not create a legally binding commitment under 5 § 706(1). *Id.*

Even if one or all of the management plans did impose a legally binding duty upon the Forest Service to take some action, that duty is not sufficiently discrete to be judicially enforceable. It is not clear what restrictions would be sufficient to align mega-load transportation with the myriad goals identified in the management plans. Nor is it clear what course of Forest Service action – imposition of criminal sanctions, notice and comment rulemaking, informal negotiation with the State of Idaho, or litigation to enforce the easement – is required or most appropriate. While Idaho River's factual allegations, taken as true, establish for purposes of this Rule 12(b)(6) proceeding that regular mega-

---

[1]     The Forest Service argues that the document Plaintiff characterizes as the "River Plan," a Forest Service document titled "A Design for Wild and Scenic Rivers: Middle Fork Clearwater, Selway and Lochsa," is not the current guidance document upon which the Forest Service relies in its management decisions. This dispute does not effect the Court's resolution of the issue. Even the excerpts of the document that Plaintiff quotes characterizes its directives as"primary management objectives," which are not akin to implementation decisions. *See Amended Complaint* at ¶ 60.

**Memorandum Decision and Order - 18**

load transport along Highway 12 is inconsistent with the spirit of the Forest Service management plans, "[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action." *SUWA*, 542 U.S. at 66.

IRU argues that these management plans compel discrete agency action because of the precise language of the statute directing the Forest Service to comply with the plans. Attempting to distinguish their claim from that faced in *SUWA*, Idaho River alleges that the Forest Service is statutorily required to "take action," a command more specific than the mandate faced in *SUWA* that the BLM "manage" lands consistent with its land use plans. *Compare* 43 U.S.C. § 1732(a); *with* 16 U.S.C. § 1283. IRU maintains that the *SUWA* Court held that "manage" was a vague term insufficient to require discrete agency action. *See SUWA*, 542 U.S. at 66. In contrast, IRU claims the word "action" in the WSRA should be read consistent with the definition of that word in the Administrative Procedures Act. *See* U.S.C. § 551(13).

This argument fails for several reasons. First, the Ninth Circuit in *Gardner* held that 42 U.S.C. § 1732(b), which contains "take action" language, did not create a discrete agency obligation to act. *Gardner v. U.S. Bureau of Land Management*, 638 F.3d 1217, 1222 (9th Cir. 2011); *see* 42 U.S.C. § 1732(b) ("In managing the public lands the Secretary shall, by regulation or otherwise, *take any action* necessary to prevent unnecessary or undue degradation of the lands." (emphasis added)). Second, even if the

**Memorandum Decision and Order - 19**

difference in statutory language were material,[2] it is not clear how Idaho River's

argument renders the myriad policy goals of the management plans judicially

administrable.  The management plans remain statements of priorities, offering imprecise

guidance as to how the Court could judge Forest Service compliance without inserting

itself into day-to-day administration of federal lands.  *SUWA*, 542 U.S. at 71.

        Accordingly, the Court will grant the Forest Service's Motion to Dismiss to the

extent it seeks to dismiss that portion of Idaho River's Second Claim that challenges the

Forest Service's failure to act under 5 U.S.C. § 706(1).  Because the Court's disposition

of this argument turns on a purely legal argument which could not be cured through

amendment, it is dismissed with prejudice.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 762

(9th Cir. 2007) (dismissal with prejudice appropriate where amendment is futile).

**B.      First Claim for Relief**

        In its First Claim for Relief, IRU alleges that the Forest Service has declined to

take enforcement action solely based on the erroneous conclusion that it lacks jurisdiction

to do so.

        Plaintiff's claim relies on the Ninth Circuit's decision in *Montana Air*.  In that case

the Circuit adopted an exception to the bar on judicial review of "presumptively

unreviewable" agency decisions not to take enforcement action when the agency's

"decision is based solely on [its] belief that [it] lacks jurisdiction to issue such a

---

        [2]      In fact, this does not appear to be a distinction at all, because the BLM regulations at
issue in *SUWA* also required that "all future resource management authorizations and *actions* . . . shall
conform to the approved plan." *SUWA*, 542 U.S. at 67 (quoting 43 C.F.R. § 1610.5-3(a) (2003)).

**Memorandum Decision and Order - 20**

complaint." *Montana Air*, 898 F.2d at 756.  The court held that where the agency had erroneously disclaimed jurisdiction to act, it could remand to the district court to issue an order directing the agency to exercise its discretion in accordance with the court's clarification of the scope of the agency's statutory jurisdiction.  *Id.* at 763.

*Montana Air* was decided before *SUWA* and it is not clear if it survived that decision.  *See SUWA*, 542 U.S. at 67 (rejecting the ability of a federal court, absent a discrete agency obligation to act, to "simply enter a general order compelling compliance with [a statutory mandate], without suggesting any particular manner of compliance."). The Forest Service, however, has not argued that *Montana Air* does not provide a viable legal theory.  In fact, none of the Forest Service's briefs cite to *Montana Air*.  Nor has the Forest Service contested that the sources of authority cited by IRU do authorize the Forest Service to take *discretionary* enforcement or regulatory actions in response to the transport of mega-loads through federal lands.

Because the Forest Service, at this point, has not refuted Idaho River's legal theory under *Montana Air,* and because IRU has plead adequate facts to establish a plausible claim under that theory, the Court will deny the Forest Service's Motion with respect to that claim.  The Court emphasizes, however, that it does not make a ruling as to whether the *Montana Air* exception is good law.  Nor does it rule that IRU has correctly interpreted the scope of the Forest Service's discretionary authority under the various cited statutes, regulations, and management plans. The Court simply holds that, at this juncture, IRU has pled facts sufficient "to state a claim to relief that is plausible on its

face." *Twombly*, 550 U.S. at 570.

## C.     Third Claim for Relief

In its Third Claim, IRU alleges that the Forest Service and the FHWA have failed in their affirmative, mandatory duty to enforce the terms of the Highway Easement Deed granted to the State of Idaho in 1995.  This Claim again requires the Court to determine if, under § 706(1) of the APA, either agency has a discrete and legally binding duty to enforce the terms of the easement.

### 1.     Forest Service Duty to Enforce the Easement

IRU alleges that the Forest Service is required to enforce the terms of the easement by the WSRA (specifically, 16 U.S.C. § 1281(a)), and also by the terms of Corridor Maintenance Strategy.  The Court has found above that (1) § 1281(a) does not impose any discrete legal duty on the Forest Service, and (2) the Corridor Management Strategy's statement of priorities does not impose a legally required or discrete duty on the Forest Service.  Neither authority permits the Court to order the Forest Service to take any particular action to enforce the terms of the Highway Easement Deed.

### 2.     FHWA Duty to Enforce the Easement

IRU argues that the FHWA is required to enforce the terms of the easement by 23 U.S.C. § 116(c), which authorizes the Secretary of Transportation to take remedial action against a state when it fails to maintain federally funded state highway projects.  That statute states as follows:

> If at any time the Secretary shall find that any project constructed under the provisions of this chapter, or constructed under the provisions of prior Acts, is not

being properly maintained, he shall call such fact to the attention of the State transportation department. If, within ninety days after receipt of such notice, such project has not been put in proper condition of maintenance, the Secretary shall withhold approval of further projects of all types in the State highway district, municipality, county, other political or administrative subdivision of the State, or the entire State in which such project is located, whichever the Secretary deems most appropriate, until such project shall have been put in proper condition of maintenance.

IRU argues that this statute requires the Secretary of Transportation to act in this instance because (1) the easement granted to the state of Idaho qualifies as a "project" under § 116(c), and (2) the ITD has failed to properly maintain Highway 12 by authorizing the transport of mega-loads.

The Court concludes, however, that § 116(c) does not impose a legally binding commitment that the FHWA take enforcement action. Idaho River's claim is indistinguishable from that considered and rejected by the Circuit in *Gardner.* There, the plaintiff challenged the BLM's failure to prohibit the use of off-road vehicles pursuant to the BLM's authority under 43 C.F.R. § 8341.2(a). *Gardner*, 638 F.3d at 1223. That regulation requires that "where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects . . . the authorized officer shall immediately close the areas affected to the type(s) of vehicle causing the adverse effect." 43 C.F.R. § 8341.2(a).

The Circuit ruled that "the predicate to the BLM's regulatory mandate to close the areas affected by off-road vehicle use is a finding by the BLM of 'considerable adverse effects' on the enumerated resources." *Gardner*, 638 F.3d at 1223 (quoting 43 C.F.R. § 8341.2(a)). Because the regulation did not "specify a process or particular timing for the

**Memorandum Decision and Order - 23**

BLM to determine when off-road vehicles are causing "'considerable adverse effects,'" *id*. at 1224, and because the BLM had not made any such determination, *id.* at 1223, the court held that the BLM had not failed to take a required, discrete agency action.

Analogous to the regulation at issue in *Gardner*, 23 U.S.C. § 116(c) does not require the Secretary of Transportation to act until they have made a finding that a project is not being properly maintained.  Section 116(c) mandates that, "If at any time the Secretary shall find that any project . . . is not being properly maintained, he shall call such fact to the attention of the State transportation department."  This statutory language does not impose any time limit or otherwise fetter the Secretary's discretion in making a finding of improper maintenance.  *See id.* at 1224.  In fact, the law is explicit that the Secretary is allowed to make a finding of improper maintenance "at any time."

IRU does not allege that the Secretary has made a finding that the state of Idaho is improperly maintaining federal projects along Highway 12.  Until the Secretary has made such a finding, the Court has no authority to compel agency action under § 706(1) of the APA.

**D.      Fourth Claim for Relief**

In its Fourth Claim, IRU alleges that the FHWA has failed to ensure the maintenance of "[n]umerous projects associated with Highway 12 [which] have been undertaken with federal funds, including, but not limited to, the development of the Corridor Management Plan, the placement of interpretive signs, and the construction of passing lanes."  *See Amended Complaint* at ¶ 175.  IRU again relies on 23 U.S.C. §

116(c) as the statutory provision that requires the FHWA to ensure that federally-funded highway projects are properly maintained.  Because the Court has found that § 116(c) does not impose a mandatory duty on the FHWA, it will grant the Motion to Dismiss that portion of IRU's claim alleging that the FHWA has a legally required duty to take enforcement action against the State of Idaho.

The Fourth Claim also includes an allegation that the FHWA erroneously concluded that it lacked discretionary authority under 23 U.S.C. § 116(c).  IRU argues that this claim should be maintained under *Montana Air.*  The Court agrees.  The threshold requirement under *Montana Air* is that the agency has failed to take an action based on the belief that it lacks the authority to do so.  *Montana Air*, 898 F.2d at 756.  The Amended Complaint alleges that the FHWA has broadly disclaimed authority to take action in response to mega-load transport.  *See Amended Complaint* at ¶ 142. (alleging that the FHWA "determined that the conversion of the Northwest Passage Scenic Byway in a high-and-wide corridor was a 'state issue'").  In addition, IRU relies on a letter from Secretary of Transportation Ray LaHood to Representative Peter DeFazio.  *See Letter of October 15, 2010 (Dkt. 16-1)*.  *Knievel*, 393 F.3d at 1076 (allowing review of documents referenced in complaint whose authenticity is not disputed).

This letter does not mention § 116(c), and is focused on asserting that states, rather than the FHWA, have responsibility for issuing permits to the mega-load carriers.  But it was responding to a broad criticism by Representative DeFazio who not only urged the FHWA to take a hard look at permitting but also levied broad criticisms of the mega-

loads – he warned that taxpayers would be burdened with the cost of repairing the

extensive road damage caused by the mega-loads.  He clearly wanted the FHWA to assert

oversight jurisdiction, and Secretary LaHood just as clearly rebuffed him.  That is

confirmed by the agency memo quoted in IRU's Amended Complaint:  "[O]ur official

line is still that FHWAS has no official role or authority over this matter.  Our

headquarters is in agreement with this."  *See Amended Complaint* at ¶ 142.

It therefore appears from the allegations of the Amended Complaint that the

FHWA has disclaimed authority to act under 23 U.S.C. § 116(c).  Accordingly, the Court

will again apply *Montana Air* and refuse to dismiss this part of IRU's allegations.

## CONCLUSION

In accordance with the analysis above, the Court will grant in part the Forest

Service's motion to dismiss.  The motion is granted with respect to those portions of the

Second and Third Claims seeking relief under 5 U.S.C. § 706(1) and alleging that the

Forest Service has a mandatory, non-discretionary duty to act are dismissed.  The motion

is denied with regard to the First Claim and with regard to those portions of the Second

and Third claims alleging that the Forest Service erroneously concluded that it lacked

authority to regulate the mega-loads.

The Court will also grant in part the FHWA's motion to dismiss.  The Court will

dismiss that portion of the Fourth Claim brought under 5 U.S.C. § 706(1) alleging that the

FHWA has a legally required duty to take enforcement action against Idaho.  The Court

will deny the motion as to the claim that the FHWA erroneously concluded that it lacked

the authority to take enforcement action against Idaho.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Defendant United States Forest Service's Motion to Dismiss (Dkt. 16) is GRANTED IN PART AND DENIED IN PART. The motion is granted with respect to those portions of the Second and Third Claims seeking relief under 5 U.S.C. § 706(1) and alleging that the Forest Service has a mandatory, non-discretionary duty to act. The motion is denied in all other respects.

IT IS FURTHER ORDERED, that defendant Federal Highway Administration's Motion to Dismiss (Dkt. 21) is GRANTED IN PART AND DENIED IN PART. The motion is granted as to that portion of the Fourth Claim seeking relief under 5 U.S.C. § 706(1) and alleging that the FHWA has a mandatory, non-discretionary duty to act. The motion is denied in all other respects.

DATED:  **March 9, 2012**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision and Order - 27**