UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO RIVERS UNITED,<br><br>                      Plaintiff,<br><br>     v.<br><br>UNITED STATES FOREST SERVICE,<br>and UNITED STATES FEDERAL<br>HIGHWAY ADMINISTRATION,<br><br>                     Defendants. | Case No. 1:11-CV-95-BLW<br><br>**MEMORANDUM DECISION** |

**INTRODUCTION**

The Court has before it a motion to dismiss and/or for summary judgment filed the federal defendants and a motion for partial summary judgment filed by plaintiff Idaho Rivers United (IRU). Oral argument was held on February 6, 2013, and the Court took the motions under advisement. For the reasons expressed below, the Court finds (1) that IRU's request for injunctive relief is moot as the mega-loads have ceased; (2) that IRU is entitled to a declaratory judgment that the federal defendants have legal jurisdiction to review Idaho's approvals of mega-loads over Highway 12, and (3) that IRU is not entitled to a declaratory judgment that the mega-loads violated federal law and the Highway Easement because that decision is committed in the first instance to the federal defendants.

**Memorandum Decision - 1**

FACTUAL BACKGROUND

The State of Idaho has authorized oil companies to transport hundreds of oversized loads along U.S. Highway 12, a route passing through the Clearwater National Forest and paralleling two rivers that have been designated as Wild and Scenic Rivers under the Wild and Scenic Rivers Act. Plaintiff Idaho Rivers United (IRU) claims that the Forest Service and the FHWA failed to comply with their mandatory duty to regulate the transportation of those loads through federal land.

**Highway 12 and the Wild and Scenic River Corridor**

The Idaho segment of U.S. Highway 12 is a two-lane highway that runs 177 miles from the port of Lewiston east to Lolo Pass at the Montana border. *See Amended Complaint (Dkt. No. 10) at ¶ 66.* For much of its route through Idaho, Highway 12 passes through the Clearwater National Forest, federal land regulated by the Forest Service. The State of Idaho constructed the Highway in the 1950s and '60s. *Id.* at ¶ 79. The Forest Service issued the State special use permits authorizing it to construct the Highway through the Forest. *Id.* Until 1995, the State administered the Highway pursuant to these special-use permits and two memoranda of understanding. *Id.*

In 1995, the Forest Service conveyed an easement to the FHWA, which it then conveyed to the State. *Id.* at ¶ 81. The State recorded the Highway Easement Deed in 1997. The Deed grants the Idaho Transportation Department ("ITD") "a right-of-way for the operation and maintenance of a highway" through the Forest. *See Exhibit A (Dkt. No. 21-1) at pg. 3.* The easement is subject to various conditions, including that the State

shall "[p]rotect and preserve soil and vegetative cover and scenic and esthetic values on the right of way outside of construction limits." *Id.* at pg. 6.

The Highway runs along the Middle Fork of the Clearwater and Lochsa Rivers. Both rivers were designated as Wild and Scenic Rivers by the passage of the Wild and Scenic Rivers Act in 1968. *See* 16 U.S.C. § 1274(a)(1). The Act tasked the Forest Service with administration of these river systems "in such manner as to protect and enhance . . . [their] esthetic, scenic, historic, archeologic, and scientific features." 16 U.S.C. § 1281(a).

The Surface Transportation Efficiency Act of 1991 directs the Secretary of Transportation to "carry out a national scenic byways program that recognizes roads having outstanding scenic, historic, cultural, natural, recreational, and archaeological qualities." 23 U.S.C. § 162(a). Pursuant to this statutory directive, the Secretary designated Highway 12 as the "Northwest Passage Scenic Byway" in 2002. *See Amended Complaint* at ¶ 71. Both before and after the designation of Highway 12 as a Scenic Byway, the Department of Transportation awarded grants to the State for projects supporting Highway's status as a Scenic Byway. Those grants included funding for the drafting of a "corridor management plan," construction of various interpretive and visitor's centers, and construction of passing lanes. *Id.* at ¶¶ 70, 71.

**State Authorization of "Mega-load" Transportation.**

Around October of 2008, Imperial Resources Ventures Limited ("Imperial Oil"), a partially-owned subsidiary of Exxon Mobil, contacted the IDT with a proposal to use

**Memorandum Decision - 3**

Highway 12 to transport equipment for use in tar sand mining and extraction in Alberta, Canada. *Id.* at ¶¶ 84, 89, 91. Imperial Oil proposed barging pre-manufactured mining equipment to the Port of Lewiston and then using Highway 12 to transport the equipment through Idaho.

On February 14, 2011, ITD issued a Memorandum of Decision authorizing Imperial Oil's proposal. The Memorandum authorizes Imperial Oil to use Highway 12 to transport "200 plus" separate loads, each of which significantly exceeds the State's height, width, length, and/or weight transportation restrictions. *Id.* at ¶ 85, 90. These "mega-loads" are so large that they occupy both lanes of Highway 12. *Id.* Imperial Oil's traffic control plan requires the mega-loads to travel at night, accompanied by twenty or more support vehicles. *Id.* ¶ 92. During the day, the loads will be parked in public turnouts along the highway. *Id.*

With ITD's permission, Imperial Oil has made modifications along Highway 12 in preparation for the mega-loads. In 2009, Imperial Oil paid for utility companies to upgrade utility lines that did not provide sufficient clearance. *Id.* at ¶ 93. Also in 2009, the company's contractor, Kiewit, trimmed hundreds of trees along the highway right-of-way, including over 500 in the Clearwater National Forest. *Id.* Kiewit also resurfaced and reinforced nine turnouts along Highway 12. *Id.*

In light of ITD's approval of Imperial Oil's transportation plan and the modification of the highway to accommodate those loads, several other companies have approached ITD about transporting mega-loads over Highway 12. *Id.* at ¶ 102. On

**Memorandum Decision - 4**

February 11, 2011, ConocoPhillips began transporting four oversized loads, along Highway 12 , from Lewiston to an oil refinery in Billings, Montana.  *Id.* at ¶ 98.  The Conoco loads delayed traffic along Highway 12, *id.* at ¶ 108, and occupied public turnouts where they "were parked . . . for days or weeks at a time," *id.* at ¶ 109.

ITD also issued a permit for Imperial Oil to transport a load as a "test validation module."  *Id.* at ¶ 94.  The test module left Lewiston on the evening of April 12, 2011. *Id.* at ¶ 95.  That night, the module clipped a guy wire, resulting in the downing of a power line.  *Id.* at ¶ 46.  The module was moved to a turnout and parked there for two weeks while Imperial Oil upgraded additional utility lines and trimmed trees to create greater clearance.  *Id.* at ¶ 97. Many of the trimmed trees were in the Clearwater National Forest and/or the Wild and Scenic River corridor.  *Id.*

There are additional and more-recent mega-load shipments that the Court will discuss below.

**Procedural History**

Though the Forest Service and the FHWA have expressed concern about the impact of mega-load transport on Highway 12 and the Wild and Scenic River corridor, neither agency has taken any action to prevent or regulate the loads.  Both agencies have taken the position that they lack authority to regulate the mega-load transports.  *Id.* at ¶¶ 122, 144.

The Forest Service stated its position in a September 10, 2010 letter from Clearwater National Forest Supervisor Rick Brazell ("Supervisor Brazell") to ITD. The

letter raised concerns about the impact of the mega-load transports on the Wild and Scenic River corridor. Supervisor Brazell stated, however, that "I recognize that I have no jurisdiction to stop these shipments . . . ."  *Id.* at ¶ 123.

The Secretary of Transportation, Ray LaHood, expressed this same position in correspondence with Congressman Peter DeFazio.  Secretary LaHood, in reply to a letter from Congressman DeFazio requesting that the FHWA investigate the mega-load permitting process, responded that "permit issuance for movement of this equipment is the responsibility of the states, not the Federal government."  *Id.* at ¶ 144.

Plaintiff Idaho Rivers United (IRU) is a non-profit conservation organization, whose mission is "to protect and restore the rivers of Idaho."  *Id.* at ¶ 13.  On March 10, 2011, IRU filed their first Complaint, alleging that the Forest Service had a mandatory duty to regulate mega-load transportation through the Clearwater National Forest and along the Wild and Scenic River corridor.  On June 15, 2011 IRU amended their complaint to add the FHWA as a defendant. The Amended Complaint alleged that the FHWA failed to notify the State of Idaho, pursuant to 23 U.S.C. § 116(c), that the State's authorization of mega-load transport amounted to improper maintenance of federal highway projects along Highway 12.

**Earlier Proceedings**

The Forest Service and FHWA moved to dismiss IRU's action.  This Court issued a decision dismissing IRU's claims that the federal defendants had a mandatory duty to take enforcement action against Idaho to stop the mega-loads.  The Court relied upon

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) in finding that the federal defendants in this case had no mandatory duty, and that their duty was merely discretionary in nature.

With regard to IRU's claims that the federal defendants erroneously concluded that they lacked jurisdiction to review the ITD's approval of the mega-loads, the Court found that IRU had properly stated a claim.  In making that finding, the Court relied on the holding in *Montana Air Chapter No. 29 v. Fair Labor Relations Authority*, 898 F.2d 753, 756 (9th Cir. 1990) that courts retain the authority to review an agency's decision that it lacks jurisdiction to take enforcement action.

**Pending Motions**

The federal defendants seek to dismiss the remaining issues while IRU seeks a partial summary judgment that the defendants erroneously concluded that they lacked jurisdiction over the ITD's approvals.  The Court will analyze first the mootness challenge raised by the federal defendants.

**ANALYSIS**

**<u>Mootness Challenge</u>**

This Court lacks jurisdiction to hear moot claims.  *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008).  A case becomes moot when it has "lost its character as a present, live controversy."  *Oregon v FERC*, 636 F.3d 1203, 1206 (9th Cir. 2011).  IRU's request for injunctive relief asking the Court to stop the mega-loads is moot because those shipments are completed and no additional shipments are currently under consideration.

However, even if a case is moot with respect to injunctive relief, a court may invoke jurisdiction over a claim for declaratory relief. *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 121-22 (1974).   IRU seeks a declaration that the federal defendants erroneously concluded that they lacked jurisdiction to take enforcement action against Idaho.

The federal defendants bear the burden of showing that this request for declaratory relief is moot, and that burden is a heavy one. *In re Thorpe Insulation Co*., 677 F.3d 869 (9th Cir. 2012).  A request for declaratory relief remains a live controversy when "the challenged government activity is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties."  *Super Tire,* 416 U.S. at 122.

In *Super Tire*, an employer whose workers had gone on strike sued New Jersey seeking to (1) enjoin the state from granting public welfare to the striking workers, and (2) declare the state's practice of granting welfare to striking workers as an improper interference with labor negotiations.  The strike ended and New Jersey sought to dismiss the case on mootness grounds.  The Supreme Court declined, finding that although the request for injunctive relief was moot, the request for declaratory relief remained a live controversy.  New Jersey's policy of awarding benefits to strikers was "fixed and definite" and "not contingent upon executive discretion."  *Id*. at 124.  The Supreme Court also found it important that the availability of public welfare "is a factor lurking in the background of every incipient labor contract," and so has a continuing presence that does

not evaporate or disappear when a particular strike ends.  *Id*. at 124.

      The same analysis applies here.  Both the Forest Service and the FHWA have declared, as a matter of agency policy, that they have no jurisdiction over the mega-loads. Each of these challenged decisions "is not contingent" and "has not evaporated or disappeared."  *Feldman*, 518 F.3d at 642.  Even though Forest Supervisor Brazell believed that "these loads will ultimately lead to future additional proposals," he flatly declared, without making any exceptions, "that I have no jurisdiction to stop these shipments."  Similarly, Secretary LaHood engaged in no case-specific analysis when he declared the FHWA policy that "States . . . make their own decisions regarding the permitting" of the mega-loads.  These policy statements are not dependent on the unique circumstances of specific mega-loads or the discretion of the agency director.  Thus, each agency's refusal to assert jurisdiction over the mega-loads casts a "continuing and brooding presence" over future shipments.  *Id*.

      Finally, *Super Tire* requires this Court to determine whether this continuing agency policy has a "substantial adverse effect on the interests of" IRU.  It does.  This agency stand-down makes it likely that more mega-loads will be planned and approved, just as the availability of public benefits made it more likely that workers would strike in *Super Tire*.  Here, the lack of federal oversight may encourage Idaho to be less rigorous in its analysis and shippers to be more willing to send mega-loads down Highway 12.  This is not idle speculation by the Court:  The Forest Service itself feared that the ITD's approval "will ultimately lead to future additional proposals."  Thus, the federal defendant's policy

of refusing to take jurisdiction does have a "substantial adverse effect" on the interests of IRU under *Super Tire*.

Moreover, this case is justiciable under the "capable of repetition, yet evading review" exception to the mootness doctrine. The exception applies when (1) the duration of the challenged action is too short to allow full litigation before it ceases or expires, and (2) there is a reasonable expectation that the plaintiff will be subjected to the challenged action again. *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1018 (9th Cir. 2012). While this doctrine applies only in "exceptional situations," *Vegas Diamond Properties, LLC v. F.D.I.C.*, 669 F.3d 933, 936 (9th Cir. 2012), such circumstances are present here. As discussed above, the Forest Service itself predicts that the ITD's approvals will prompt more mega-load shipments in the future. This prediction has already proven correct. On Friday, November 30, 2012, the ITD issued a press release giving notice that two mega-loads "could start moving on U.S. 12 as early as Monday," just two days later. *See ITD News Release (Dkt. No. 54-4)*.[1] This gives IRU merely a

---

[1] This ITD News Release was not contained in the administrative record, but both sides submitted material outside the record for the Court to review on this mootness issue. *See Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 729 (10th Cir.1997) (holding that documents outside the administrative record may be used to resolve mootness issue). The only documents outside the record examined by the Court were related to mootness. This renders moot the motion to supplement the administrative record. The federal defendants submitted the affidavit of Alan Frew of ITD, signed on August 27, 2012, stating that "[n]ew permits would have to be issued for any more oversized loads to travel on Highway 12 in Idaho. I am the State Officer who will have to make the decision to issue any such permits. There are no requests for such permits pending in my office. I know of no such requests forthcoming." *See Frew Declaration (Dkt. No. 46-3)*. However, on the very day that counsel filed this Declaration – October 17, 2012 – the ITD announced that it was issuing another mega-load permit. *See ITD News Release (Dkt. No. 54-2)*.

**Memorandum Decision - 10**

weekend to track down a judge, somehow resolve the thorny legal jurisdictional issue, and get a ruling on an injunction.  This is the very definition of "capable of repetition yet evading review."

For all of these reasons, the Court refuses to dismiss as moot that portion of IRU's lawsuit challenging the federal defendants' decision that they lack jurisdiction to review ITD's approval of the mega-loads.[2]

## Federal Jurisdiction Over Mega-Loads

IRU challenges decisions of the federal defendants that they have no jurisdiction to review ITD's approval of mega-loads over Highway 12.  The Court may set aside an agency decision if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Purely legal questions are reviewed de novo.  *See Akiak Native Community v. U.S. Postal Service*, 213 F.3d 1140, 1144 (9th Cir. 2000).  This case presents a purely legal question regarding the authority of the federal defendants to review ITD approvals of mega-loads over Highway 12.  Hence, the Court will review the agency decisions de novo.

The Ninth Circuit has held that courts may review an agency's decision that it lacks jurisdiction or authority to take enforcement action.  *Montana Air Chapter No. 29 v. Fair Labor Relations Authority*, 898 F.2d 753, 756 (9th Cir. 1990).  The federal defendants argue that *Montana Air* was overruled by *Norton v. Southern Utah Wilderness*

---

[2]  The federal defendants devote only a few sentences to a standing challenge.  The Court finds that the affidavits submitted by IRU establish their standing.

**Memorandum Decision - 11**

*Alliance*, 542 U.S. 55 (2004)  ("*SUWA*").  The Court disagrees.  *SUWA* held that the

courts cannot review an agency's failure to act.  But *SUWA* specifically noted that the

APA does allow court review of an agency denial of a request that it sanction, compel, or

prohibit some act.  *Id*. at 62; 5 U.S.C. § 551(10) & (13) (agency action made subject to

review includes the "denial" of an agency to take a "restrictive action").  *SUWA* noted

that

> a "failure to act" is not the same thing as a "denial."  The latter is the agency's
> act of saying no to a request; the former is simply the omission of an action
> without formally rejecting a request – for example, the failure to promulgate
> a rule or take some decision by a statutory deadline.

*Id*. at 63.  *Montana Air* addressed a denial; *SUWA* addressed a failure to act.  Because

*SUWA* expressly distinguished a denial from a failure to act, *SUWA* did not overrule

*Montana Air*.  Accordingly, the Court will reject the argument of the federal defendants

that the Court cannot review their decisions that they lack jurisdiction in this case.  The

Court will turn now to the substantive issue of whether the federal defendants correctly

concluded that they lacked jurisdiction over ITD's approvals of the mega-loads.

    The Property Clause gives Congress plenary power to regulate the use of federal

land.  *See* U.S.Const., Art. IV, s 3, cl. 2 (stating that "Congress shall have Power to

dispose of and make all needful Rules and Regulations respecting the Territory or other

Property belonging to the United States").  This provision is "without limitations,"

*McFarland v. Kempthorne*, 545 F.3d 1106, 1112 (2008), and gives Congress the power

over public lands "to control their occupancy and use, to protect them from trespass and

**Memorandum Decision - 12**

injury, and to prescribe the conditions upon which others may obtain rights in them . . . ."

*Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976).

Pursuant to this constitutional authority, Congress passed the Federal-Aid Highway Act of 1956, vesting authority in the Secretary of Transportation to determine whether federal lands should be used for roads by the states.  *See* 23 U.S.C. § 317.  The Secretary is directed to consult with the federal agency administering the lands to determine if that agency has any objection.  *Id.*  In this case, the Secretary consulted with the Forest Service.  Congress vested the Forest Service, in the Organic Act of 1897, with a broad authority to regulate activities within the National Forests.  *See* 16 U.S.C. § 551 (authorizing the Forest Service to "regulate the[] occupancy and use and to preserve the forests from destruction").

The Forest Service agreed to have the FHWA issue an easement to Idaho to operate Highway 12 "provided that certain conditions were included in the deed."  *See Answer (Dkt. No. 4)* at ¶ 60.  In 1995, the FHWA issued the Highway Easement to Idaho. It requires the State of Idaho to "protect and preserve soil and vegetative cover and scenic and esthetic values on the right of way outside of construction limits."  That language was not happenstance; the Wild and Scenic Rivers Act requires that any easement "shall be related to the policy and purposes of this Act."  16 U.S.C. § 1284(g).  The policy of the Act is to identify those rivers that "possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, . . . or other similar values," so that they may be "preserved in free-flowing condition, and . . . protected for the benefit and enjoyment of present and

future generations." *See* 16 U.S.C. § 1271.  The Act directs the Forest Service to "protect such rivers in accordance with the purposes of this chapter." *See* 16 U.S.C. § 1283(a).

This line of authority – beginning with the Property Clause and proceeding through the Organic Act, the Federal-Aid Highways Act, the Wild and Scenic Rivers Act, and finally the Highway Easement's directive to protect the scenic and esthetic values of the river corridor – is focused on granting the federal defendants the authority to regulate the use of roads over federal land.  This authority clearly gives the federal defendants jurisdiction to review ITD's approval of mega-load permits that authorize acts along the river corridor including the construction of turnouts along the rivers, the trimming of hundreds of trees, and the restriction of the public's recreational opportunities.

The federal defendants respond, however, that "[t]he State of Idaho's permitted activities were for a 'highway purpose' and occurred within the limits of their deeded right-of-way." *See Federal Defendants' Reply Brief (Dkt. No. 61)* at p. 6.  But there is no evidence in this record that the federal defendants made any such findings after reviewing ITD's approvals – indeed, it is precisely that review that IRU seeks to compel in this lawsuit.  Moreover, this argument ignores the most salient feature of the Highway Easement –  the use of the easement for "highway purposes" was expressly conditioned upon the State of Idaho's agreement to "[p]rotect and preserve soil and vegetative cover and scenic and esthetic values on the right of way. . . ."

The federal defendants also cite *State of Colorado v Toll*, 268 U.S. 228 (1925) as authority holding they lack jurisdiction to regulate roads like Highway 12 contrary to

**Memorandum Decision - 14**

state law.  That case, like this one, involved a grant by federal authorities to a state to allow a road to be built over federal land.[3]  But unlike this case, the grant in *Toll* contained no restrictions on the state similar to those placed on Idaho by the Highway Easement to protect the river corridor's scenic and esthetic values.  Thus, *Toll* says nothing about whether the federal agency maintains jurisdiction to ensure that the state is abiding by the terms of an easement.  Indeed, the Ninth Circuit has held that the federal government retains a right to regulate the manner of use of rights-of-way established under the same statute addressed in *Toll*.  *See U.S. v. Vogler*, 859 F.2d 638, 642 (9th Cir. 1988) (holding that federal agency had authority to regulate manner of use of right-of-way established under R.S. § 2477).

The federal defendants argue that federal law, specifically 49 U.S.C. §§ 31112 & 3, "specifically delegates to the States the authority to permit oversize and overload vehicles to use highways if it is 'a vehicle or load that cannot be dismantled easily or divided easily and that has been issued a special permit under applicable state law.'"  *See Defendants' Opening Brief (Dkt. No. 45-1)* at pg. 9.  This is a bold argument.  It requires specific language waiving the Government's rights, discussed above, under the Property Clause, the Organic Act, and the Wild and Scenic Rivers Act, all passed long prior to § 31112 & 3.  Yet there is no such language. The statutes simply allow states to grant

---

[3]  The grant in *Toll* was made under Revised Statutes, § 2477 (Comp. St. § 4919), codified as amended at 43 U.S.C. § 932 (repealed in 1976 by FLPMA), which authorized the right-of-way for the construction of highways over public lands.

**Memorandum Decision - 15**

special use permits for vehicles of a large size.  There is no language that grants to states the exclusive and non-reviewable right to issue such permits.  "[A]bsent a clearly expressed congressional intention, repeals by implication are not favored." *J.L. v. Mercer Island School Dist.*, 592 F.3d 938, 951 (9th Cir. 2010).  The Court finds this argument without merit.

Finally, the federal defendants point out that the Highway Easement was granted under 23 U.S.C. § 317, which requires that the federal agency administering the land "does not object that the appropriation is contrary to the public interest or inconsistent with the purposes for which such lands have been reserved or has agreed to the appropriation and transfer under conditions deemed necessary for the adequate protection and utilization for the reserve."  The federal defendants argue that they raised no objection when the easement was issued, and that to review ITD's approvals "would render § 317's certification and approval by [the federal defendants] meaningless."  This argument stands § 317's certification on its head.  By granting the easement, the federal defendants were certifying under § 317 that the easement was not "contrary to the public interest or inconsistent with the purposes" of the land, and that its condition (that Idaho protect the scenic and esthetic values of the river corridor) was a "condition deemed necessary for the adequate protection and utilization for the reserve."  Far from rendering § 317 meaningless, the federal defendants' review of ITD's approval of mega-loads fulfils the very purpose of § 317 by ensuring compliance with the grant under that statute – the Highway Easement.

**Memorandum Decision - 16**

For all of these reasons, the Court finds that the federal defendants have jurisdiction to review the ITD's approval of the mega-loads over Highway 12.

**Other Declaratory Relief Requested by IRU**

IRU also seeks a declaratory judgment that the mega-loads were an unauthorized expansion of use under the Highway Easement and are hence unlawful.  Having held that the federal defendants have jurisdiction to review ITD approvals of mega-loads, the Court cannot now usurp the defendants' jurisdiction and make that decision for them.  *See Alaska Survival v. Surface Transp. Bd.*, 2013 WL 264653 (9th Cir. Jan. 23, 2013) (stating that the court should not substitute its judgment for that of the agency).  Because the federal defendants have made no decision on the merits of the mega-loads, there is no "final agency action" to review, as the APA requires.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–94 (1990) (holding that challenges to agency land management procedures require final agency action).  For these reasons, the IRU's claims seeking a declaratory judgment that the mega-loads were not authorized must be dismissed.

**Conclusion**

For all of these reasons, the Court finds for IRU on its claim in Count One seeking a declaratory judgment that the federal defendants have jurisdiction to review ITD approvals of mega-loads over Highway 12.  While the Court has reviewed those decisions de novo, as stated above, it would reach the same result under the more deferential arbitrary and capricious standard of 5 U.S.C. § 706(2)(A).

The Court will dismiss the remainder of IRU's action.  Specifically, the Court

finds moot IRU's request for injunctive relief because no mega-load shipments are currently under consideration or proceeding along Highway 12.  The Court will also dismiss the remaining claims seeking a declaration that the mega-loads constituted an unauthorized use under the Highway Easement or any federal law.  That decision is committed to agency discretion in the first instance and there is no agency decision for the Court to review.

The Court shall enter a separate Judgment as required by Rule 58(a).


DATED:  **February 7, 2013**



_____
Honorable B. Lynn Winmill
Chief U. S. District Judge